**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-02913-NYW

COLORADO ACCESS,

     Plaintiff,

v.

ATLANTIC SPECIALTY INSURANCE COMPANY, and
THE MEDICAL PROTECTIVE COMPANY,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Insurers Atlantic Specialty Insurance Company and The Medical Protective Company's Motion for Summary Judgment (the "Insurers' Motion for Summary Judgment") [Doc. 36] and Plaintiff's Cross-Motion for Summary Judgment [Doc. 41]. Upon review of the Motions and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Insurers' Motion for Summary Judgment is respectfully **DENIED**, and Plaintiff's Cross-Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This civil action arises out of an insurance coverage dispute between Plaintiff Colorado Access, Inc. ("Plaintiff" or "Colorado Access") and Atlantic Specialty Insurance Company ("ASIC") and The Medical Protective Company ("MedPro") (collectively, "Defendants" or "Insurers"). *See generally* [Doc. 6]. Generally, Colorado Access alleges that the Insurers have a

duty to indemnify Colorado Access with respect to a settlement agreement it entered into in 2021. *See* [*id.* at ¶¶ 14–20]. Colorado Access asserts three claims in this case: (1) breach of contract against ASIC; (2) bad faith breach of an insurance contract against ASIC and MedPro; and (3) unreasonable delay or denial of insurance benefits under Colo. Rev. Stat. §§ 10-3-1115 and -1116 against ASIC and MedPro. [*Id.* at 4–5]. The Insurers have asserted one declaratory judgment counterclaim against Colorado Access, seeking a "judgment that they are not obligated to indemnify Colorado Access for the settlement payment it made as part of the Settlement Agreement." [Doc. 20 at 22, ¶ 40].

On March 30, 2022, the Insurers filed the Insurers' Motion for Summary Judgment. *See* [Doc. 36]. Therein, they argue that the plain language of the insurance Policy issued to Colorado Access unambiguously excludes Plaintiff's settlement payment from indemnification coverage. *See* [*id.* at 1]. On this basis, they argue that they are entitled to summary judgment on each of Plaintiff's three claims. [*Id.* at 16]. Plaintiff filed its Cross-Motion for Summary Judgment on April 20, 2022, arguing that it is entitled to summary judgment with respect to the legal question of whether the insurance Policy excludes the settlement payment from indemnification coverage. [Doc. 41 at 6]. Both Motions are fully briefed, [Doc. 46; Doc. 51], and are thus ripe for resolution.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the Parties' briefing and are undisputed unless otherwise noted.

1.      Plaintiff Colorado Access is a corporation that oversees mental health services. [Doc. 36 at ¶ 1; Doc. 41 at ¶ 1; Doc. 27 at 5, ¶ 2].

2.      Defendant ASIC issued a Managed Care Errors and Omissions Liability Policy (the "Policy") to Colorado Access, with a coverage period from February 27, 2019 to February 27, 2020.  [Doc. 36 at ¶ 20; Doc. 41 at ¶ 20; Doc. 36-19].[1]

3.      The Policy provides coverage for "Damages and Claim Expenses in excess of the Retention that you are legally obligated to pay as a result of a Claim for . . . an act, error, or omission, or series of acts, errors, or omissions, committed or allegedly committed by you or on your behalf in the performance of a Managed Care Activity."  [Doc. 36 at ¶ 21; Doc. 41 at ¶ 21; Doc. 36-19 at DEFS_000010 (emphasis omitted)].[2]

4.      The Policy defines "Damages" as including "any settlements, judgments, pre-judgment interest, post-judgment interest . . ., or other amounts . . . which you are legally obligated to pay as the result of a Claim."  [Doc. 36 at ¶ 23; Doc. 41 at ¶ 23; Doc. 36-19 at DEFS_000014 (emphasis omitted)].

5.      However, the Policy definition of "Damages" does not include "any payment, restitution, return, or disgorgement of any fee, profit, royalty, premium, commission, or charge, or any fund allegedly wrongfully or unjustly held or obtained, including but not limited to any profit, remuneration or advantage to which you were not legally entitled" or "any amount any of you pay or may be obligated to pay under any contract or agreement, including but not limited to any policy,

---

[1] Neither Party explains MedPro's relation to this case, but each side collectively refers to Defendants as the "Insurers."  *See generally* [Doc. 36; Doc. 41].  For purposes of background context only, the Court notes that Plaintiff's Complaint alleges that MedPro "advised Colorado Access that it was handling [Plaintiff's insurance] claim on behalf of ASIC."  [Doc. 6 at ¶ 13].  Because no Party requests that the Court do otherwise, the Court treats MedPro and ASIC collectively for purposes of this Order, as the Parties do the same.

[2] Generally, this Court cites to the page number assigned by its Electronic Case Filing ("ECF") System.  However, in referring to the Policy, the Court cites to the Bates Numbers used by the Parties for consistency purposes.

bond, benefit plan, or provider agreement."  [Doc. 36 at ¶ 23; Doc. 41 at ¶ 23; Doc. 36-19 at DEFS_000014–15 (emphasis omitted)].

6.      Colorado Access entered into Facility Provider Agreements ("FPAs") with three Institutions of Medical Disease: Cedar Springs Hospital Inc., d/b/a Cedar Springs Behavioral Health; UHS of Denver, d/b/a Highlands Behavioral Health; and UHS of Centennial Peaks, d/b/a Centennial Peaks Hospital (collectively, the "IMDs").  [Doc. 36 at ¶ 3; Doc. 41 at ¶ 3; Doc. 27 at 5, ¶ 4; Doc. 37-1].

7.      The IMDs provide residential behavioral health services to Medicaid patients in Colorado.  [Doc. 36 at ¶ 2; Doc. 41 at ¶ 2; Doc. 27 at 5, ¶ 3].

8.      On August 22, 2019, the IMDs alleged that Colorado Access had breached its contractual duties under the FPAs because it failed to pay for patients who stayed at the IMDs for more than 15 days.  [Doc. 36 at ¶ 4; Doc. 41 at ¶ 4; Doc. 36-3].

9.      The IMDs demanded that Colorado Access pay $600,000 for those patients, pursuant to the FPAs.  [Doc. 36 at ¶ 4; Doc. 41 at ¶ 4; Doc. 36-3 at 1].

10.      On August 26, 2019, Colorado Access reported the demand to the Insurers ("Underlying Claim").  [Doc. 36 at ¶ 5; Doc. 41 at ¶ 5; Doc. 36-4].

11.      The Insurers sent a letter to Colorado Access on September 25, 2019 stating: "In the Demand Letter, the UHS seeks amounts allegedly owed pursuant to a contract or agreement . . . and/or return of fees that have (allegedly) been wrongly or unjustly withheld.  None of these types of relief constitute Damages as defined by the Policy. . . .  [ASIC] reserves all rights with regard to the Definition of[] . . . Damages."  [Doc. 36 at ¶ 6; Doc. 41 at ¶ 6; Doc. 36-5 at 3].[3]

_____

[3] The Parties do not dispute the contents of this letter, but do disagree on the meaning of this language.  *See* [Doc. 36 at ¶ 6; Doc. 41 at ¶ 6].

12.     The IMDs submitted an arbitration demand on October 21, 2019, alleging that Colorado Access had breached its obligations under the FPAs.  [Doc. 36 at ¶ 7; Doc. 41 at ¶ 7; Doc. 36-6 at 4].

13.     On June 22, 2020, the arbitrator issued a written ruling in favor of the IMDs and against Colorado Access, ruling that the FPAs "unambiguously provide[] for payment of IMD stays without a 15[-]day limit."  [Doc. 36 at ¶ 9; Doc. 41 at ¶ 9; Doc. 36-11 at 5].[4]

14.     The arbitrator scheduled a damages hearing, but before the damages hearing was held, Colorado Access challenged the arbitrator's role due to an alleged conflict of interest.  The American Arbitration Association ("AAA") appointed another arbitrator to evaluate the arbitration decision.  [Doc. 36 at ¶ 11; Doc. 41 at ¶ 11; Doc. 36-12 at 1–2; Doc. 37-2 at 1].

15.     A new arbitrator was appointed, and the new arbitrator sent an email to the arbitrating parties on December 14, 2020 stating: "I will evaluate [the conflict] at the time of the final hearing[5] with any information the parties wish to submit (if any) or to argue.  At this point, though, because a mid-proceeding disqualification does go to the overall integrity of the process, I will revisit the summary judgment ruling if the undisclosed conflict is shown to have impacted the ruling, directly or indirectly."  [Doc. 36 at ¶ 12; Doc. 41 at ¶ 12; Doc. 36-14 at 1].[6]

---

[4] The Insurers assert that the arbitrator "issued a written ruling in favor of the IMDs and against Colorado Access, holding that the FPAs required Colorado Access to pay for the patient stays." [Doc. 36 at ¶ 9].  Plaintiff "admits that [the arbitrator] . . . issued a ruling holding that the IMD[s] were entitled to compensation" but "denies Insurers' characterization of [the arbitrator's] findings."  [Doc. 41 at ¶ 9].  The exact nature of Plaintiff's dispute is unclear; regardless, no Party disputes the language of the arbitrator's decision.

[5] It is unclear from the Parties' briefing whether or when any final hearing was scheduled.

[6] The Parties dispute whether this email constitutes a "holding."  *See* [Doc. 36 at ¶ 12; Doc. 41 at ¶ 12].  This dispute is not material for purposes of this Order.

16.     Colorado Access submitted a settlement offer to the IMDs on November 2, 2020 to resolve the arbitration dispute.  [Doc. 36 at ¶ 13; Doc. 41 at ¶ 13; Doc. 20 at 17, ¶ 17; Doc. 21 at ¶ 17].

17.     On April 22, 2021, Colorado Access entered into a Settlement Agreement with the IMDs.  [Doc. 36 at ¶ 15; Doc. 41 at ¶ 15; Doc. 45-2].

18.     The Settlement Agreement states that Colorado Access and the IMDs "entered into [FPAs] which govern the contractual relationship between the Parties" and states that the "Parties have agreed to a settlement of [the IMDs'] claims against Colorado Access with respect to the 15 Day Dispute and Arbitration."  [Doc. 36 at ¶ 15; Doc. 41 at ¶ 15; Doc. 45-2 at 1].

19.     After paying the settlement, Colorado Access sought reimbursement from the Insurers for the settlement.  [Doc. 36 at ¶ 18; Doc. 41 at ¶ 18; Doc. 36-18 at 1].

20.     On August 12, 2021, the Insurers denied coverage for the settlement because "the settlement does not constitute covered 'Damages' as defined in the Policy, and, therefore, does not fall within the coverage grant."  [Doc. 36 at ¶ 19; Doc. 41 at ¶ 19; Doc. 36-18 at 1 (emphasis omitted)].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation omitted).

"[I]t is not the party opposing summary judgment that has the burden of justifying its claim; the movant must establish the lack of merit." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1110 (10th Cir. 2009).  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *see also* 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (4th ed. 2022) (explaining that the nonmovant cannot rely on "mere reargument of his case or a denial of an opponent's allegation" to defeat summary judgment).  In considering the evidence, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court will "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant." *Adler*, 144 F.3d at 670.

Finally, "[c]ross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross

motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## ANALYSIS

The Insurers move for summary judgment on Plaintiff's claims and their singular counterclaim. *See* [Doc. 36 at 1]. In support of their request for judgment in their favor, they rely on the Policy's definition of Damages, which excludes "any amount any of you pay or may be obligated to pay under any contract or agreement." [*Id.* at 7 (emphasis omitted)]. They argue that, pursuant to this language, the Policy does not provide coverage for "damages arising out of contract disputes," and because the Settlement Agreement resolved a contractual dispute, they have no duty to reimburse Colorado Access for the settlement payment. [*Id.* at 7, 11]. Furthermore, they argue that because there is no duty to indemnify, they are similarly entitled to summary judgment on Plaintiff's bad faith claims. [*Id.* at 15].

Plaintiff disagrees. It too seeks summary judgment, but on a single issue: whether the Policy provides indemnification coverage for the settlement payment paid to the IMDs. [Doc. 41 at 10–14]. Moreover, it argues that its bad faith claims cannot be determined as a matter of law by the Court, but must instead be reserved for determination by a jury. [*Id.* at 17]. The Court addresses the Parties' arguments below.

## I.     Colorado Contract Law and Insurance Law Principles

Because this Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶ 20], the Court applies the substantive law, including the choice-of-law principles, of the forum state. *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994). Colorado law provides that interpretation of an insurance contract is governed "by the law of the state with the most significant relationship to the insurance contract." *Berry & Murphy, P.C. v. Carolina Cas. Ins.*

*Co.*, 586 F.3d 803, 808 (10th Cir. 2009).  The Parties do not engage in a choice-of-law analysis in their briefing or direct the Court to a choice-of-law provision in the subject Policy, but both sides raise arguments under Colorado law.  *See* [Doc. 36 at 7–8; Doc. 41 at 9–10].  The Court thus assumes that Colorado law applies here.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

"In a contract case, a motion for summary judgment allows for contract interpretation as a matter of law."  *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013) (citing *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003)).  "An insurance policy's terms are construed according to principles of contract interpretation: a court seeks to give effect to the intent and reasonable expectations of the parties."  *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019).  Under this approach, "words should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended."  *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990); *see also Saiz v. Charter Oak Fire Ins. Co.*, 299 F. App'x 836, 839–40 (10th Cir. 2008).  "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term."  *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)).

The policyholder bears the burden of demonstrating coverage under an insurance policy. *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1260 (10th Cir. 2020) (applying Colorado law).  If the insured meets this burden, the burden shifts to the insurer

"to prove the applicability of an exclusion from coverage." *Id.* "Any exclusion must be clear and specific to be enforceable." *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1287 (10th Cir. 2006) (applying Colorado law); *see also J & S Enters., Inc. v. Cont'l Cas. Co.*, 825 P.2d 1020, 1023 (Colo. App. 1991) ("Only if exclusions, when viewed as a whole, unambiguously and unequivocally negate coverage are they interpreted in the insurer's favor."). "To obtain the benefit of an exclusion, an insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation." *Leprino Foods*, 453 F.3d at 1287 (citing *Am. Fam. Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991)). If the insurer meets this burden and demonstrates that an exclusion applies, the burden then shifts back to the insured to show an exception to the coverage exclusion. *Rocky Mountain Prestress*, 960 F.3d at 1260.

"[T]he Colorado Supreme Court follows the doctrine of reasonable expectations." *Sullivan*, 842 F. App'x at 254. Under this doctrine, Colorado courts will not enforce an exclusionary provision "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." *Bailey*, 255 P.3d at 1043. "If, based on how an ordinary, objectively reasonable insured would read the whole policy, the question of whether certain coverage exists is 'susceptible to more than one reasonable interpretation,' then the coverage provisions are ambiguous, to be construed against the insurer as the drafter of the policy." *Id.* at 1051 (quoting *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005)). "[T]he question of whether an ambiguity exists is always an objective test: policy terms should be read in the sense in which the insurer had reason to believe they would be interpreted by the ordinary reader and purchaser." *Id.* (quotations omitted).

## II.     Analytic Framework

Before turning to the Parties' substantive arguments, the Court must first ascertain the appropriate characterization of the provisions at issue here.  Colorado Access frames the subject provisions as coverage exclusions, *see* [Doc. 41 at 9], while the Insurers "suggest that the definition of reimbursable 'Damages' simply defines Insurers' indemnification obligations and is not an 'exclusion.'"  [Doc. 46 at 7 n.2].  The Insurers cite no authority in support of this suggestion.  [*Id.*]. In order to resolve this dispute, the Court begins with the language of the Policy itself.  [Doc. 36-19].

### A.     Policy Coverage

The Policy states, *inter alia*, that it will pay, on Colorado Access's behalf, "**Damages** and **Claim Expenses** in excess of the Retention that [Colorado Access is] legally obligated to pay as a result of a **Claim** for: . . . an act, error, or omissions, or series of acts, errors, or omissions, committed or allegedly committed by [Colorado Access] or on [its] behalf in the performance of a **Managed Care Activity**."  [Doc. 36-19 at DEFS_000010, § I(A)].[7]  On August 26, 2019, Colorado Access provided notice that "Universal Healthe [sic] Services, Inc is demanding payment or repayment of denial and or Recoupment of IMD claims up to 15 days.  Details in the attached letter."  [Doc. 36-4 at 1].  The attached letter is a correspondence between counsel for UHS and Colorado Access dated August 22, 2019.  [Doc. 36-3].  The Parties do not dispute that the Underlying Claim fits within the Policy Coverage and that it does not trigger the section of the Policy entitled "What This Policy Excludes."  *See generally* [Doc. 36-19 at DEFS_000010–11; Doc. 36; Doc. 41; Doc. 46; Doc. 51].

---

[7] Unless otherwise noted, all emphases in the language quoted from the Policy are in the original Policy.  *See* [Doc. 36-19].

Thus, the Court turns to the definition of "Damages."  Under the Policy:

> **Damages** means any settlements, judgments, pre-judgment interest, post-judgment interest, claimant's attorney's fees in an amount equal to the percentage that any **Damages** covered under this Policy for any settlement or judgment bear to the total amount of such judgment or settlement, or other amounts (including punitive, multiple, or exemplary damages if insurable under the **Law Most Favorable to Insurability**) which **you** are legally obligated to pay as a result of a **Claim**.

[Doc. 36-19 at DEFS_000014].  Here, Colorado Access seeks to recover from Defendants the amount of a settlement it entered into with IMDs.  *See* [Doc. 37-3].  There appears to be no dispute that such recovery would fall within the definition of "Damages," but for the following Policy language:

> **Damages** does not include:
> …
>
> (3)    any payment, restitution, return, or disgorgement of any fee, profit, royalty, premium, commission, or charge, or any fund allegedly wrongfully or unjustly held or obtained, including but not limited to any profit, remuneration or advantage to which **you** were not legally entitled [(hereinafter "Exclusion (3)")];
>
> (4)    any amount any of **you** pay or may be obligated to pay under any contract or agreement, including but not limited to any policy, bond, benefit plan, or provider agreement [(hereinafter "Exclusion (4)")].

[Doc. 36-19 at DEFS_000014–15].

## B.    Whether Exclusions (3) and (4) Act as Coverage Exclusions[8]

An "exclusion" is "an insurance-policy provision that excepts certain events or conditions from coverage." *Exclusion*, Black's Law Dictionary (11th ed. 2019); *Rivera v. Am. Fam. Ins. Grp.*, 292 P.3d 1181, 1184 (Colo. App. 2012).  "[I]t is not necessary that all limitations [on coverage] appear as exclusions from coverage," *Urtado v. Allstate Ins. Co.*, 528 P.2d 222, 223 (Colo. 1974), and indeed, Colorado courts have determined that insurance policy provisions may operate as

---

[8] The Parties make no arguments that Exclusions (3) and (4) should be characterized differently.

exclusions even if not expressly delineated as such.  *See, e.g.*, *Rivera*, 292 P.3d at 1183; *Hughes v. Essentia Ins. Co.*, 516 P.3d 31, 35 (Colo. App. 2022); *Praetorian Ins. Co. v. Axia Contracting, LLC*, 488 F. Supp. 3d 1042, 1049 (D. Colo. 2020).

Defendants have cited no authority supporting their contention that the Policy provisions do not operate as exclusions, and the Court is not persuaded that the burden on an insurer would be any different if a coverage limitation were contained in a term definition as opposed to in a formal "exclusion" page of an insurance policy.  *See Astellas US Holding, Inc. v. Starr Indem. & Liab. Co.*, 566 F. Supp. 3d 879, 897 (N.D. Ill. 2021) ("The location of language within an insurance contract does not necessarily control which party bears the burden of proof on that provision."); *UnitedHealth Grp. Inc. v. Hiscox Dedicated Corp. Member*, 2010 WL 550991, *6–7 (D. Minn. 2010) (treating an exception to the definition of "damages" as an exclusion).  Accordingly, the Court construes the subject provisions as coverage exclusions.  To demonstrate that an exclusion applies here to bar coverage, the Insurers must demonstrate that the provision is unambiguous and "not subject to any other reasonable interpretation."  *Leprino Foods*, 453 F.3d at 1287.

## III.   The Insurers' Motion for Summary Judgment

### A.   Contract Interpretation

As set forth above, Exclusion (4) excludes from the definition of "Damages" "any amount . . . *you pay or may be obligated to pay under any contract or agreement*."  [Doc. 36-19 at DEFS_000015 (emphasis added)].  The Insurers argue that this exclusionary provision is plain, unambiguous, and subject to only one reasonable interpretation: that the Exclusion "provides that indemnification for damages arising out of contract disputes . . . are not covered Damages."  [Doc. 36 at 7]; *see also* [*id.* at 11–12 ("Colorado Access was in a contract dispute, a dispute over its obligations under the [FPAs], and the Policy simply does not obligate Insurers to reimburse

Colorado Access for damages arising from th[is] dispute[].")].  The Insurers focus their arguments on the nature of the underlying dispute between Colorado Access and the IMDs, as well as the arbitration proceedings.  *See generally* [*id.* at 8–11].

Colorado Access counters that the Insurers' interpretation of Exclusion (4) is too broad. *See* [Doc. 41 at 14].  It argues that the provision "is not tied to whether the parties have a 'contractual dispute' or . . . triggered by the mere fact of the existence of a contract with the opposing party." [*Id.*].  Instead, it asserts that the phrase "you pay or may be obligated to pay under any contract or agreement" under Exclusion (4) "excludes from indemnification any amounts that are contractually owed and that the insured chooses to pay." [*Id.* at 14–15].  Plaintiff suggests that the provision is unambiguous, arguing that "this is the only reasonable interpretation" of this language because the Policy provides coverage for certain Managed Care Activities, such as "the submission, handling, payment, and denial of claims; management of behavioral health programs; and triage of payments for mental health care." [*Id.* at 15]; *see also* [Doc. 36-19 at DEFS_000015].  According to Plaintiff, "[a] patent ambiguity would . . . exist if the Policy expressly covered indemnity for third-party claims arising out of Colorado Access'[s] payment and denial of payment for mental health care services pursuant to a provider contract, but then excluded that very same thing by virtue of" Exclusion (4). [Doc. 41 at 15].  Neither side suggests that Exclusion (4) is ambiguous.  [Doc. 36; Doc. 41].

***Defendants' Arguments.***  The Court begins with the plain language of the Policy.  *See Berry*, 586 F.3d at 808.  As set forth above, the Policy expressly states: "**Damages** does not include . . . any amount any of **you** pay or may be obligated to pay under any contract or agreement, including but not limited to any policy, bond, benefit plan, or provider agreement." [Doc. 36-19 at DEFS_000014–15].  The Court respectfully disagrees with the Insurers' position that the

14

exclusionary provision clearly and unambiguously excludes indemnification coverage for *all* "damages arising out of contract disputes." *See* [Doc. 36 at 7]. The Court first emphasizes that the Exclusion does not plainly exclude indemnification coverage based on the nature of the underlying dispute, or (as Defendants suggest) exclude *all* damages arising from *all* contractual disputes, such that a person of ordinary intelligence would attach that meaning to the Exclusion. *Bailey*, 255 P.3d at 1051. Indeed, the Policy does not plainly reference the existence of a "dispute," instead focusing on the *legal nature* of the obligation giving rise to the payment. *See* [Doc. 36-19 at DEFS_000015].

Next, other provisions within the Policy call the Insurers' plain-meaning argument into question. *See Bailey*, 255 P.3d at 1051 (observing that a court must construe an insurance policy as a whole and cannot read any provision in isolation). Notably, in contrast to the language at issue here, other provisions in the Policy *do* expressly exclude indemnification coverage based on the type of underlying claim or dispute. *See, e.g.*, [Doc. 36-19 at DEFS_000010, DEFS_000012 ("No coverage will be available under this Policy for any . . . **Damages** . . . based upon or arising out of any actual or alleged . . . creation, development, design, manufacture, . . . or sale of any computer," or "based upon or arising out of any actual or alleged infringement, misappropriation, [or] misuse [of] . . . any patent")]; *see also generally* [*id.* at DEFS_000010–13]. "One must presume that if the same meaning were intended, the same words would have been used. Thus, the Court infers that some different meaning was intended." *Wagner v. Am. Fam. Ins.*, 968 F. Supp. 2d 1100, 1106 (D. Colo. 2013), *aff'd*, 569 F. App'x 574 (10th Cir. 2014); *cf. Weitz Co., LLC v. Mid-Century Ins. Co.*, 181 P.3d 309, 313–14 (Colo. App. 2007) ("The use of different terms in the policy signals that those terms should be afforded different meanings."). If ASIC intended to exclude coverage for Damages "based upon or arising out of any actual or alleged [*breach of*

contract]," it could have included that clear language in the Policy.  It did not do so.  *See Fight Against Coercive Tactics Network, Inc. v. Coregis Ins. Co.*, 926 F. Supp. 1426, 1433 (D. Colo. 1996) ("If [the insurer] had intended to carve out an exception to its duty to pay for losses, including defense costs which the [i]nsureds are legally obligated to pay, it could have used alternative language putting the matter beyond reasonable question."); *Praetorian*, 488 F. Supp. 3d at 1049 ("To the extent an insurer seeks to avoid liability, it 'must do so in a clear and unequivocal language and must call such limiting conditions to the attention of the insured.'" (quoting *Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 306 (Colo. 2003))).

Moreover, the Court notes that the Policy's delineated exceptions to the definition of "Damages" largely reference the *type* or *source* of the excluded relief, as opposed to broadly referencing a type of excluded underlying *dispute*—i.e., the meaning Defendants urge the Court to assign to Exclusion (4) here.  *See, e.g.*, [Doc. 36-19 at DEFS_000014–15 (excluding "any fine, penalty, forfeiture, sanction, tax, fee, liquidated damages, or amount imposed by statute, rule, regulation, or other law," "any non-monetary or equitable relief or redress," and "any loss, cost, or expense of correcting . . . any policy, practice, [or] procedure")]; *cf. Beecham v. United States*, 511 U.S. 368, 371 (1994) (in statutory interpretation context, stating, "[t]hat several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well"); *see also Northland Ins. Co. v. Rhodes*, No. 09-cv-01691-REB-CBS, 2010 WL 5110107, at *7 (D. Colo. Dec. 9, 2010) (using statutory interpretation canons to interpret an insurance policy). Accordingly, this Court respectfully declines to adopt Defendants' interpretation of Damages to include any and all amounts owed by Colorado Access arising from any contractual dispute.

***Plaintiff's Arguments.***  Plaintiff suggests that the exclusion to Damages as set forth in Exclusion (4) unambiguously refers only to "amounts that are contractually owed and that the

insured chooses to pay, but then turns around and asks ASIC to reimburse." [Doc. 41 at 14–15]. Respectfully, the Court finds Plaintiff's suggested interpretation—requiring some sort of voluntary payment from the policyholder—is also incorrect. Nothing within the plain language of the Policy introduces the concept of "voluntariness" of any such damages, i.e., that the insured must "choose[] to pay" such amount. Upon review of the record, this Court respectfully declines to adopt either side's interpretation of Exclusion (4).

Instead, the Court concludes that this Exclusion unambiguously applies only to those amounts arising from obligations arising from a binding and applicable contract or agreement. "Under" is defined in the contractual context as "required by : in accordance with : bound by." *Under*, Webster's Third New Int'l Dictionary 2487 (1993 ed.); *see also Cap. One, N.A. v. Colo. Dep't of Revenue*, 509 P.3d 1078, 1081 (Colo. App. 2022) (noting that where a contractual term is not defined, courts may "look to the dictionary definitions of that term to ascertain its plain and ordinary meaning"). Thus, the Policy excludes from indemnifiable Damages any amount that is paid "under" a contract or agreement only if the payor is contractually required to pay that amount. *Cf. Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d 546, 549–50 (Ariz. 2018) (construing the phrase "personal liability under any contract or agreement" to mean "personal liability *required by* . . . a contract" (emphasis added)). Similarly, "obligate" is defined as, *inter alia*, "placed under obligation." *Obligate*, Webster's Third New Int'l Dictionary 1556 (1993 ed.); *see also Obligation*, Black's Law Dictionary (11th ed. 2019) (defining "obligation" as "[a] legal or moral duty to do or not do something"). The Parties' arguments to the contrary have not persuaded this Court otherwise.[9]

---

[9] The Insurers contend that Exclusion (4)'s use of the word "may" means that any mere *allegation* of a breach of contract triggers application of the exclusion. *See* [Doc. 36 at 13 ("It does not matter that Colorado Access disagrees with the Arbitrator's decision holding that it was contractually

## B.      Whether Defendants Have Established that the Settlement Payment Falls Within Exclusion (4)

"To obtain the benefit of an exclusion, an insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation."  *Leprino Foods*, 453 F.3d at 1287; *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 523 (Colo. App. 2004) ("Exclusionary clauses exempting the insurer from providing coverage in certain circumstances must be written in clear and specific language and construed in favor of coverage.").  Based on the factual record before it, the Court concludes that the Insurers have not met this burden at summary judgment.

The Insurers argue that the entire $850,000 settlement amount[10] is excludable under the Policy because it was made in settlement of a breach of contract claim, evidenced by the arbitrator's determination that Colorado Access breached the FPAs by failing to pay for mental health treatment at the claimant facilities when the inpatient stays exceeded 15 days.  *See* [Doc. 36 at 9; Doc. 46 at 10–11].  But this Court has already rejected the contention that any monetary amount that is merely associated with a breach of contract claim is excluded from Policy coverage,

---

obligated to pay the IMDs; what matters is that the IMDs <u>alleged</u> that Colorado Access breached its contract." (emphasis in original))]; *see also* [Doc. 46 at 3 ("Insurers are not obligated to Indemnify Colorado Access for <u>any</u> amounts alleged to be owed under contracts or provider agreements." (emphasis in original))].  But, as noted above, other exclusionary provisions in the Policy expressly exclude indemnification coverage for disputes resting on certain types of allegations—e.g., excluding claims "based on or arising out of *actual or alleged*" intellectual property infringement or any "*actual or alleged* violation of any responsibility, duty, or obligation imposed under the Securities Act of 1933." *See* [Doc. 36-19 at DEFS_000012 (emphasis added)].  Again, had ASIC intended to exclude all coverage arising out of breach-of-contract allegations, it could have done so clearly and expressly.  *See Wagner*, 968 F. Supp. 2d at 1106.  It did not.

[10] The copy of the Settlement Agreement docketed at [Doc. 37-3] is a restricted version of the publicly filed, redacted Settlement Agreement docketed at [Doc. 45-2].  While the redacted version redacts the amount of the Settlement Agreement, *see* [Doc. 45-2 at 1], the Court notes that the Parties have each referenced the settlement amount in publicly filed documents.  *See, e.g.*, [Doc. 41 at 9; Doc. 46 at 13].  In addition, the amount of the settlement payment is material to the Court's analysis in this Order.  Accordingly, the Court finds it appropriate to include the settlement amount in this Order.

*see supra*, and the Insurers have not established that the *entirety* of the $850,000 is associated with payments due from Colorado Access to the IMDs under the applicable FPAs.  Indeed, Plaintiff contends that a portion of the settlement amount included "amounts that compensated UHS for its attorneys fees and costs, which UHS demanded in the arbitration."[11]  [Doc. 41 at 16]; *see also* [Doc. 41-1 (the arbitration demand)].

Because the Insurers have not demonstrated that the exclusion unambiguously applies to exclude coverage for the entirety of the $850,000 settlement, the Insurers' Motion for Summary Judgment is respectfully **DENIED** as to all claims.  *See* [Doc. 36 at 15 (the Insurers arguing that because there is no duty to indemnify, they are entitled to summary judgment on the breach of contract claim, and because there is no breach of contract, they are entitled to summary judgment on the bad faith claims)].

**IV.  Plaintiff's Cross-Motion for Summary Judgment**

As noted above, each side moves for summary judgment in their own right, and therefore, this Court treats the Motions as "individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party."  *Banner Bank*, 916 F.3d at 1326.  Colorado Access seeks summary judgment "as a matter of law" that "the monies that it paid to bring the litigation with the [IMDs] to a close . . . fall outside the enumerated 'exceptions' to the definition of **Damages** in the Policy."  [Doc. 41 at 6].  The definition of "Damages" contains six enumerated exceptions.  *See* [Doc. 36-19 at DEFS_000014–15].  Colorado Access argues that four of the exceptions "are clearly inapplicable"[12] and raises substantive

---

[11] This Court does not pass on whether any portion of the $850,000 settlement amount is attributable to attorney's fees and costs, or whether such portion would be subject to Exclusion (4), as that issue is not currently before this Court.

[12] The Insurers do not address this argument.  *See* [Doc. 46].  Thus, any argument that these additional exceptions to Damages as defined by the Policy apply here is deemed waived.  *See Klen*

arguments as to the remaining two exceptions: the exclusion of amounts paid or which may be obligated to be paid under any contract or agreement (i.e., Exclusion (4)), discussed above, and Exclusion (3), which excludes from coverage "any payment, restitution, return, or disgorgement of any fee, profit, royalty, premium, commission, or charge, or any fund allegedly wrongfully or unjustly held or obtained, including but not limited to any profit, remuneration or advantage to which you were not legally entitled." *See* [Doc. 36-19 at DEFS_000014; Doc. 41 at 12–17].

## A.    Exclusion (3)

Plaintiff argues that Exclusion (3) "describes monies that are presumptively due and paid to an insured at the outset of a transaction . . . but which the claimant later disputes and which must ultimately be returned because the insured was not entitled to them." [Doc. 41 at 12]. It asserts that the settlement payment was not remuneration that Colorado Access was paid and was then obligated to repay, and thus, Exclusion (3) does not apply here. [*Id.* at 13].

In their combined Reply in support of the Insurers' Motion for Summary Judgment and Response to Plaintiff's Cross-Motion for Summary Judgment, the Insurers focus their arguments on the contractual nature of the underlying dispute, maintaining that the Policy unambiguously excludes coverage for all damages arising from all contract disputes under Exclusion (4). [Doc. 46 at 6–15]. With respect to Exclusion (3), the Insurers assert that:

> Colorado Access moves for summary judgment on the question of whether [Exclusion] (3) to the definition of "Damages" relieves Insurers of any obligation to indemnify Colorado Access for its Settlement. It is not necessary for the Court to resolve this dispute because the contract clause in [Exclusion] (4) independently relieves Insurers of any obligation to indemnify. If the Court wishes to resolve this issue, it should be resolved in Insurers' favor. Under [Exclusion] (3), Damages does not include "any payment restitution, return, or disgorgement of . . . any fund allegedly wrongfully or unjustly held or obtained, including . . . any profit,

---

*v. Colo. State Bd. Of Agric.*, No. 05-cv-02452-EWN-CBS, 2007 WL 2022061, at *24 (D. Colo. July 9, 2007); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 880 n.8 (10th Cir. 1997).

> remuneration or advantage to which you were not legally entitled." Here, the Settlement Agreement was clearly a payment for funds which Colorado Access should have paid to the IMDs and which were "wrongfully or unjustly held." Colorado Access had an obligation to pay the IMDs for inpatient stays exceeding 15 days and it withheld money which it legally owed to the IMDs.

[Doc. 46 at 15 n.7 (citations omitted)].

As explained above, the Insurers bear the burden of establishing the applicability of a Policy exclusion. *See Rocky Mountain Prestress*, 960 F.3d at 1260. "To obtain the benefit of an exclusion, an insurer must establish that the exclusion applies and is not subject to any other reasonable interpretation." *Leprino Foods*, 453 F.3d at 1287. Only if the insurer meets this burden does the burden shift back to the insured to establish that an exception to the exclusion applies. *Rocky Mountain Prestress*, 960 F.3d at 1260.

Here, the Insurers do not meaningfully explain or argue why Exclusion (3) applies in this case and do not address Plaintiff's suggestion that Exclusion (3) should be interpreted to apply only to payments wrongfully made to and then returned by the insured. Instead, the Insurers raise a one-sentence argument—contained in a footnote—asserting that the Exclusion applies but providing no suggested counter-interpretation of the provision. [Doc. 46 at 15 n.7]. "Arguments raised in a perfunctory manner, such as in a footnote, are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (observing that a court may decline to consider argument which is unsupported and inadequately briefed). The Court cannot conclude that the Insurers have met their burden of demonstrating the Exclusion's applicability here. *See Rocky Mountain Prestress*, 960 F.3d at 1260; *Leprino Foods*, 453 F.3d at 1287. Accordingly, Plaintiff's Cross-Motion for Summary Judgment is **GRANTED in part**, only insofar as it seeks judgment in its favor that Exclusion (3) does not apply here.

21

B.      **Exclusion (4)**

Colorado Access urges this Court to conclude that the entirety of the $850,000 settlement payment falls within the Policy and is not excludable because (1) the payment arises from an extracontractual obligation owed by Colorado Access to the IMDs; (2) the settlement amount is not tied to any specific service or services provided to pursuant to the contracts; and (3) the payment was not made to the IMDs, but to a third party. *See* [Doc. 41 at 14–17; Doc. 51 at 4–9].

At the conclusion of the arbitration, the arbitrator determined that the FPAs did not unambiguously exclude payment for patient stays in excess of 15 days.  [Doc. 36-11 at 3]. Contrary to Colorado Access's argument, the payment and/or recoupment of fees associated with inpatient mental health stays beyond 15 days only arises out of contracts—there is no separate extracontractual duty that obligates Colorado Access to make any payments to the IMDs.  *Cf.* [Doc. 41 at 7, 14–17].  The Arbitrator clearly rejected the argument, and so does this Court, that Colorado Access had some extracontractual obligation arising from the application of federal Medicaid regulations:

> [T]he Claimants also point out that under federal Medicaid regulations an MCO can decide to voluntarily offer services not covered or paid for by Medicaid.  During the telephonic hearing on this matter, the Respondent's counsel conceded that an MCO can offer services not paid for if it chooses to do so.  *Thus, the question here is not what federal or HCPF regulations state but rather what the contract between these parties covers.* Since the contracts concededly cover IMD stays of fewer than 15 days, the Respondents must point to a contract provision which limits payment only to stays of fewer than 15 days.

[Doc. 36-11 at 4 (emphasis added) (citation omitted)].

Nor is this Court persuaded that because the settlement amount is not tied to any specific service or services on a one-to-one basis, or because Colorado Access settled to preserve its relationships with their IMDs, that the settlement amount is not subject to some amount of exclusion.  While Colorado Access argues that "the $850,000 settlement payment was not tied to

any specific service or services provided to members pursuant to the [FPAs], which means that [the Insurers] cannot establish that any particular portion of the settlement was 'pa[id] . . . under any . . . provider agreement,'" [Doc. 41 at 16 (quoting Doc. 39-16 at 15)], the Insurers dispute this. The Insurers maintain that "the final settlement amount [was] unequivocally informed and made in light of specific amounts which Colorado Access would be obligated to pay under the FPAs," because as the settling parties "neared settlement, it was obvious that the parties determined the settlement amount based on specific claims for specific patients." [Doc. 46 at 12, 13]. In support, Defendants direct the Court to an email exchange made during the arbitration between counsel for Colorado Access and counsel for the IMDs.[13] [*Id.* at 13]. Counsel for the IMDs asked Plaintiff's counsel in those emails whether there was "[a]ny word on the last settlement discussions." [Doc. 46-6 at 3]. Plaintiff's counsel responded:

> I do not have a response for you on settlement at this point. We are struggling because our records do not reflect timely internal appeals on nearly half the claims at issue. Specifically, our records suggest that, of the claims outlined in the most recent supplemental disclosure of damages, only about $850,000 worth were properly appealed.

[*Id.* (emphasis added)]. According to the Insurers, "it is not a coincidence that the settlement was for $850,000," and "the $850,000 was calculated by reviewing specific claims for specific patients which Colorado Access never paid out to the IMDs," thus rendering the settlement payment an "amount any of you pay or may be obligated to pay under any contract or agreement, including but not limited [to] . . . [a] provider agreement." [Doc. 46 at 13, 14 (quotation omitted and first

---

[13] The Insurers refer to counsel for the IMDs as "Counsel for UHS." [Doc. 46 at 5]. Based on the Court's review of the record, it appears that the IMDs were collectively referred to as "UHS" during the arbitration and in the Settlement Agreement. *See, e.g.*, [Doc. 36-6 at 1; Doc. 45-2 at 1]. Moreover, the same counsel who represented the IMDs during the arbitration sent the above-referenced email. *See* [Doc. 36-8 at 14; Doc. 36-6 at 1; Doc. 46-6 at 3]. For purposes of clarity in this Order, the Court refers to this attorney as counsel for the IMDs.

alteration added)].  Plaintiff responds that this exchange "does not contain any admissions that any amounts were due and owing to the [IMDs] pursuant to the terms and conditions of the FPA[s]. Instead, the emails reflect that Colorado Access was conducting due diligence by investigating the alleged basis for the [IMDs'] contentions about what they were due for their services."  [Doc. 51 at 9].

The Court concludes that a genuine dispute of material fact exists as to whether the settlement payment was made pursuant to a contractual obligation under the FPAs, and thus, summary judgment is not appropriate at this juncture.  The IMDs initiated an arbitration proceeding against Colorado Access on the basis that Colorado Access had breached the FPAs by failing to pay for patient stays greater than 15 days.  [Doc. 36-3 at 1–3; Doc. 36-6].  An arbitrator determined that the FPAs "unambiguously provide[] for payment of IMD stays without a 15[-]day limit" and found in favor of the IMDs on the issue of liability, [Doc. 36-11 at 5], though no ruling as to the amount of damages owed was ever made during the arbitration.  Then, Colorado Access settled with the IMDs "with respect to the 15 Day Dispute and Arbitration" for $850,000.  [Doc. 37-3 at 1].  The Insurers suggest, with supporting evidence, that the $850,000 settlement payment was the same amount that Colorado Access's former counsel purportedly agreed were meritorious claims under the FPAs.  [Doc. 46 at 13; Doc. 46-6 at 3].  A reasonable jury could conclude, notwithstanding the lack of a definitive arbitral decision setting forth the amount owed by Colorado Access under the FPAs, that the settlement payment was thus made pursuant to Colorado Access's contractual obligations "under" the FPAs, and is thus a payment made "under . . . any contract or agreement."  [Doc. 36-19 at DEFS_000015].  Insofar as Plaintiff contests the strength or relevance of its former counsel's emails or relies on its lack of admission of liability under the FPAs, [Doc. 51 at 7–8], Plaintiff simply identifies issues that must be considered by a jury to

resolve the Parties' factual dispute.  The jury, not the Court, must resolve whether the settlement payment, or a portion thereof, was made pursuant to a contractual obligation under the FPAs.  *See* [*id.* at 8 (Plaintiff suggesting that there may be a factual issue as to whether the settlement amount "represented amounts payable under the FPA[s] that precludes summary judgment" (quotation and alteration marks omitted))]; *cf. Ryan Cos. US Inc. v. Everest Nat'l Ins. Co.*, No. CV 14-3207 (DWF/BRT), 2016 WL 409677, at *8 (D. Minn. Feb. 2, 2016) (explaining that a settlement may be apportioned between covered and non-covered claims); *Cyprus*, 74 P.3d at 301 (suggesting that a portion of a settlement agreement could be subject to indemnification).

For these reasons, Plaintiff's Cross-Motion for Summary Judgment is respectfully **DENIED in part,** insofar as it seeks a judgment that Exclusion (4) does not apply in this case.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Insurers Atlantic Specialty Insurance Company and The Medical Protective Company's Motion for Summary Judgment [Doc. 36] is **DENIED**;

(2)   Plaintiff's Cross-Motion for Summary Judgment [Doc. 41] is **GRANTED in part** and **DENIED in part**;

(3)   The stay in this matter is **LIFTED**; and

(4)   A supplemental Scheduling Conference is hereby **SET** for **March 7, 2023 at 10:00 a.m.** before Judge Nina Y. Wang.   The Parties shall **SUBMIT** a proposed Supplemental Scheduling Order no later than **February 28, 2023**, indicating specific discovery sought in light of this Memorandum Opinion and Order; the proposed timing for such discovery; and whether any privilege issues need to be resolved by the Court to facilitate such discovery.  The Parties shall file a copy of their proposed

Supplemental Scheduling Order on the docket and shall send a Word version to

Wang_Chambers@cod.uscourts.gov.

DATED:  February 16, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge